Argued and submitted July 17, 1989, affirmed January 3, reconsideration allowed
by opinion March 21, 1990
See 101 Or App 48, 788 P2d 1034 (1990)

# EMERALD PEOPLE'S UTILITY DISTRICT,
## *Appellant,*

*v.*

# PACIFICORP,
## dba Pacific Power & Light Company,
## *Respondent,*

### *and*

# PUBLIC UTILITY COMMISSION
# OF OREGON,
## *Intervenor-Respondent.*

## (L87-1282; CA A49816)

784 P2d 1112

Donald R. Stark, Portland, argued the cause for appellant. With him on the briefs were Barry L. Adamson and Williams, Fredrickson, Stark & Weisensee, Portland; and Arthur C. Johnson, Richard L. Larson, Don Corson and Johnson, Clifton, Larson & Bolin, Eugene.

Charles F. Hinkle, Portland, argued the cause for respondent. With him on the brief were Gregory R. Mowe and Stoel, Rives, Boley, Jones & Gray, Portland.

W. Benny Won, Assistant Attorney General, Salem, argued the cause for intervenor-respondent. With him on the brief were Dave Frohnmayer, Attorney General, Virginia L. Linder, Solicitor General, and Paul A. Graham, Assistant Attorney General, Salem.

Before Richardson, Presiding Judge, and Newman and Deits, Judges.

NEWMAN, J.

**NEWMAN, J.**

After adopting the resolution that ORS 35.235(1)[1] prescribes, plaintiff, a people's utility district, brought this action to condemn four hydroelectric generating plants and related facilities that defendant public utility owns and operates on the North Umpqua River.[2] Defendant and the intervenor Public Utility Commission (PUC) asserted through affirmative defenses that the proposed condemnation was not "most compatible with the greatest public good and the least private injury." The court denied plaintiff's motion to strike the defenses and, after trial, ruled in accordance with them and dismissed the action. Plaintiff appeals, and we affirm.

We state the facts consistently with those found by the court in its memorandum opinion. Defendant operates eight hydroelectric generating plants on the river, including the four that plaintiff seeks to acquire. The eight plants comprise an integrated and coordinated system. Defendant's total capacity consists of a "resource mix," of which hydroelectric power that defendant's own facilities generate constitutes 35 percent. Over half of defendant's capacity is derived from thermal sources, which are substantially more expensive than hydroelectric generation. Hydroelectric facilities play a significant role in defendant's overall "strategy" of producing and supplying electricity.

Unlike defendant's, plaintiff's current capacity consists mainly of power derived from hydroelectric sources, including power obtained at preferential rates from the Bonneville Power Administration. As a result, plaintiff's customers are already served at favorable rates, which would improve still more if plaintiff acquires defendant's power plants. The court found that the benefit to plaintiff's customers from that

---

[1] ORS 35.235(1) states:

"Subject to ORS 492.100 and 758.015, whenever in the judgment of the condemner it is necessary to acquire property for a purpose for which the condemner is authorized by law to acquire property, the condemner shall, after first declaring by resolution or ordinance such necessity and the purpose for which it is required, attempt to agree with the owner with respect to the compensation to be paid therefor, and the damages, if any, for the taking thereof."

[2] Plaintiffs made an earlier effort to acquire some of defendant's facilities pursuant to ORS 543.610. The Supreme Court held in *Emerald PUD v. PP&L,* 302 Or 256, 729 P2d 552 (1986), that, because plaintiff is not a "municipality" as that term is used in ORS 543.610, it has no eminent domain authority under that statute.

acquisition would be substantially outweighed by the economic detriment to defendant and its customers, the number of which exceed plaintiff's by many times. The costs to defendant, which would be reflected in its rate structure, would include operational inefficiency resulting from the disruption of its integrated system; increased operating costs; duplication of and inefficient use of facilities resulting from simultaneous operations by the two parties; and the cost of replacement capacity, which will have to be derived from more expensive sources. There was evidence that the construction of new hydroelectric facilities in the future is unlikely.

In its memorandum opinion, the court said:

"Although the analysis is complex, it is based upon a simple premise: Plaintiff is substituting one source of low-cost power with another, and [defendant] will be replacing the low-cost portion of its resource mix with much higher cost alternatives. * * * If [plaintiff] succeeds in acquiring the four lower plants, it will simply replace low-cost federal hydropower with low-cost private hydropower."

Defendant, on the other hand, to paraphrase the court, would incur substantial additional expense in the production and delivery of power, outmeasuring the benefits to plaintiff's customers by approximately a two-to-one ratio. The court concluded:

"The evidence in this case shows that the private injury to [defendant] is of so great a degree that [plaintiff's] decision to take the lower four plants was clearly erroneous. [Defendant] has overcome the statutory preferences to be afforded [plaintiff's] resolution and has shown that its * * * affirmative defense has merit. As such, it is a complete defense to the taking."

Plaintiff first assigns error to the court's denial of its motion to strike the affirmative defenses. Its second assignment is that the

"trial court erred in its construction of the last clause of ORS 35.235(2) as creating litigable issues and erred in concluding that [plaintiff] had abused its discretion."

Although the arguments that plaintiff offers in support of the

two assignments differ, they are substantially related, and we will discuss them together.[3]

ORS 35.235(2) provides:

"The resolution or ordinance of a public condemner is presumptive evidence of the public necessity of the proposed use, that the property is necessary therefor and that the proposed use, improvement or project is planned or located in a manner which will be most compatible with the greatest public good and the least private injury."

Plaintiff contends, first, that the statute is unconstitutional as applied, because it abridges plaintiff's condemnation authority under Article XI, section 12, of the Oregon Constitution. That provision authorizes the creation of people's utility districts, empowers the districts to "exercise the power of eminent domain," and concludes with the paragraph:

"The legislative assembly shall and the people may provide any legislation that may be necessary, in addition to existing laws, to carry out the provisions of this section."

■ Plaintiff argues that the constitutional grant of the condemnation power is unconditional and that the legislature may not impose "substantive" conditions on that authority through implementing legislation that the constitutional provision requires. We disagree. The Supreme Court has taken a broader view than plaintiff's of the scope of the legislature's authority under Article XI, section 12. In *People's Util. Dist. et al v. Wasco Co. et al,* 210 Or 1, 305 P2d 766 (1957), the court rejected the argument that the state's taxation of the district's property violated Article XI, section 12. It explained that the constitutional provision

"is not self-executing. The legislature could not have been compelled to pass any legislation pursuant to Art XI, § 12, and, thus, it could have prevented the formation of people's utility districts entirely. To say that once it has created them according to the constitutional mold, it subsequently burdened them, the objects of its own creation, would be an imposition on the wide scope of legislative action heretofore recognized by this court." 210 Or at 19.

---

[3] The one argument that is peculiar to the motion to strike, that the affirmative defenses were not adequately alleged, lacks merit.

Moreover, eminent domain was comprehensively regulated by statute in Oregon long before Article XI, section 12, was adopted in 1930. The grant of eminent domain authority in section 12 is stated in general terms. The legislative implementation clause of the section clearly envisioned that existing or subsequent legislation relating to the subject would define the details of and limitations on the districts' condemnation authority.

Plaintiff's remaining arguments under these assignments relate to the meaning and application of ORS 35.235(2). The parties' principal disagreement concerns the extent to which plaintiff's decision to acquire the facilities is subject to judicial review. In *City of Eugene v. Johnson,* 183 Or 421, 192 P2d 251 (1948), the court said:

> "[T]he necessity, propriety, or expediency of appropriating property for public use, the amount and location of the property to be taken, and its suitableness for the proposed use are all political or legislative questions. And the determination of those matters, by a grantee of the power of eminent domain is, in the absence of fraud, bad faith or abuse of discretion, final and not subject to review by the court." 183 Or at 426.

The definition that the Supreme Court has developed for abuse of discretion by a condemner is that the taking decision must be "clearly erroneous." *See Port of Umatilla v. Richmond et al,* 212 Or 596, 321 P2d 338 (1958). In *Moore Mill & Lbr. Co. v. Foster,* 216 Or 204, 244, 336 P2d 39, 337 P2d 810 (1959), the court equated abuse of discretion with a decision having "no basis in reason and * * * without any economic justification."

■■ The parties appear to agree that, to rebut the "presumptive evidence" that arises under ORS 35.235(2) from plaintiff's taking resolution, defendant must show an abuse of discretion.[4] Plaintiff, however, takes a narrow view, and

---

[4] In *dicta* in *State ex rel City of Eugene v. Woodrich,* 295 Or 123, 132-33, 665 P2d 333 (1983), the court left open the question of whether the phrase "presumptive evidence" in ORS 35.235(2) incorporates the "abuse of discretion" and other standards of review developed in cases that predated the statute. The court suggested, but also left unresolved, the alternative possibility that the presumptions may be conclusive. We do not agree with that suggestion. The term "presumptive evidence," as distinct from terms such as "conclusive presumption" or "establishes," connotes that contrary evidence may be heard and weighed. For purposes of this opinion, we assume without deciding that nothing less than the abuse of discretion that the trial court found would suffice to rebut the statutory presumption.

defendant and PUC a broad one, of the matters that are reviewable in connection with the greatest public good/least private injury test in ORS 35.235(2). Plaintiff maintains that the text and history of ORS 35.235(2) demonstrate that the statute was designed only to codify the common law defenses of public use and necessity and that the phrases "greatest public good" and "least private injury" do not create additional "litigable issues." We disagree. The statute specifies that the resolution is presumptive evidence of public necessity for the use, necessity for the property *and* compatibility with the greatest public good and least private injury. Plaintiff's argument would make surplusage of the third item, the phrase in question, which plainly does not replicate the first two.[5]

Plaintiff argues next that, "if [the test of the greatest public good/least private injury] bears any intended meaning at all," it applies only to siting decisions and not "to the condemnation of an existing facility"—that is, it applies only to the planning or location of proposed uses, improvements or projects, not to the acquisition of existing ones with existing locations. Plaintiff asserts that it intends to make no *new* use of the property, and, therefore, the test does not apply. Again, we disagree. The proposed new *public use* of the facilities is clearly within the purview of the statutory requirement. ORS 35.235(2) need not expressly mention "acquisitions" as well as plans and locations. Acquisitions by eminent domain are *the subject* of ORS chapter 35, and the plans and locations referred to in ORS 35.235(2) are *for* the public acquisition and use of private property.

Plaintiff also argues that economic considerations of the kind on which the court based its decision are not reviewable for abuse of discretion, are outside the intended reach of the greatest public good/least private injury test and are inherently legislative rather than judicial in nature. As noted

---

[5] Plaintiff argues at some length that defendant and the trial court misplace their reliance on *NW Natural Gas v. Georgia-Pacific,* 53 Or App 89, 630 P2d 1326, *rev den* 291 Or 893 (1981), where we concluded that a property owner could challenge by affirmative defense the *"disputable* presumptions" favoring a *private* condemner under ORS 35.235(3), including the presumption of the greatest public good and least private injury. We agree with plaintiff that *NW Natural Gas* is not squarely controlling, because the relevant statutory provisions and the questions to be decided in the two cases are not identical. Our interpretation of ORS 35.235(2) is consistent with, but not dependent on, *NW Natural Gas.*

earlier, the court said in *Moore Mill & Lbr. Co. v. Foster, supra,* 216 Or at 244, that the absence of "any economic justification" is one of the bases for a finding of abuse of discretion. Indeed, economic factors will often be components of the private injury and the public good that result from a public taking of private property. The statutory test necessarily requires the courts to consider those economic benefits and harms in applying ORS 35.235(2).

Plaintiff relies on cases in which the courts rejected "substantive due process" and declined to substitute their view of "economic wisdom" or policy for that of legislative bodies. Those cases do not persuade us that plaintiff's decision is beyond any judicial inquiry into economic issues. The issue here is not economic wisdom or policy, but economic benefit and injury. This case does not involve a judicial displacement of a legislative body's judgment; it involves the judicial application of a state statute that requires the courts to determine whether a condemnor has abused its discretion through a taking that is not compatible with the greatest public good and least private injury.

■        Plaintiff also argues that the economic aspects of a public condemner's condemnation decision can seldom warrant the conclusion that the taking constitutes an abuse of discretion. It states:

"Whether, and to what extent, an economic analysis yields net public benefits or detriments depends upon the many assumptions used in the analysis, including factors about which utility experts disagree."

It concludes:

"Although the evidence shows that different persons may come to different conclusions, no fair reading of all the evidence supports the finding of abuse of discretion."

The court, in its memorandum opinion, analyzed the economic evidence and offered convincing reasons for finding an abuse of discretion. Although the ultimate question of abuse of discretion is one of law, *Port of Umatilla v. Richmond et al, supra,* 212 Or at 622, we agree with the trial court's findings of the underlying facts, and we also agree that the conclusion follows from them that plaintiff abused its discretion.

■ Plaintiff argues, however, that, even if economic factors may be *considered,* they should not be *solely determinative* and that

> "[n]umerous non-economic factors have historically been relied upon by condemners in determining what, as a legislative matter, was in the public's best interests justifying the power of eminent domain."

The non-economic value that plaintiff identifies here is:

> "Public ownership of utility property generally, and hydroelectric generating facilities specifically, has been held to be in the public interest, *irrespective* of any particular economic analysis." (Emphasis plaintiff's.)

Plaintiff's argument would nullify the statutory test of the greatest public good/least private injury. If a people's utility district's ownership of facilities, in and of itself, could outweigh *all* private economic injury, the taking of the facilities would automatically justify itself and the statutory test would be meaningless as applied to a PUD's acquisition of private power facilities. We conclude that defendant established that the taking would not be compatible with the greatest public good and least private injury and that plaintiff's first and second assignments lack merit.

■ Plaintiff's third assignment is that the court "erred in construing ORS 35.235(2) as imposing 'procedural' requirements and in denying [plaintiff's] objections to the evidence offered to establish a defense of 'procedural abuse of discretion.' "[6] The merits of the "procedural abuse of discretion" defense were not decided, because the court concluded that the proposed taking was an abuse of discretion under the *substantive* greatest public good/least private injury test. The case was tried to the court, and if the third assignment identifies any error, it could not have been prejudicial to plaintiff. For similar reasons, we need not address the merits of plaintiff's fourth assignment, that the court erred by permitting the intervention of PUC. PUC's involvement to date did not have a prejudicial effect on plaintiff. It contends that prejudice would result if PUC were allowed to participate in the

---

[6] The parties use the term "procedural abuse of discretion" in discussing how plaintiff made its decision to take the facilities, *e.g.,* whether it had to and did *consider* the comparative benefits and injury, as distinct from whether the consummated decision *was* compatible with the greatest public good and least private injury.

damages phase of the case, but, under our holding, that phase will not occur.

Affirmed.